Formatted for Electronic DistributionNot for Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

Filed & Entered
On Docket
03/27/2024

_____

In re:

    **Pekin Brook Farm, LLC,**Case # 20-10207
           **Debtor.**Chapter 7

_____

In re:

    **Stone Wolf Cap. Mgmt. Co.,**Case # 20-10208
           **Debtor.**Chapter 7

_____

*Appearances:*

    Paul A. Levine, Esq.Ryan M. Long, Esq.
    *Lemery Greisler LLC**Primmer Piper Eggleston & Cramer PC*
    Albany, New YorkBurlington, Vermont
    *For the Chapter 7 Trustee**For the Trust F/B/O Dianne Rose*
    *U/A DTD 9/12/02*

**<u>MEMORANDUM OF DECISION</u>**
**<u>ON REMAND FROM U.S. DISTRICT COURT, OVERRULING TRUSTEE'S</u>**
**<u>OBJECTION TO CLAIM NO. 4 AS TO PEKIN BROOK FARM, LLC</u>**

    The United States District Court remanded this matter for this Court to further consider the allowance of the Rose Trust Claim and to determine whether recharacterization of that claim is appropriate under the facts and circumstances of this case.[1] Recharacterization only becomes relevant if the Rose Trust Claim survives the Trustee's objection to claim. For the reasons set forth below, the Court overrules the Trustee's Objection to Claim, allows the Rose Trust Claim as to Pekin Brook, and determines that the facts and circumstances of this case do not warrant recharacterization of that claim to equity.[2]

**<u>JURISDICTION</u>**

    The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered by the U.S. District Court on June 22, 2012. The Court declares this contested matter to be a core proceeding according to 28 U.S.C. § 157 (b)(2)(B), over which this Court has constitutional authority to enter a final judgment.

---

[1] *See* doc. # 142 at pp. 16-17.
[2] This opinion states the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 9014 and 7052.

**PROCEDURAL HISTORY AND DIRECTION FROM THE DISTRICT COURT**

On June 26, 2020, Pekin Brook Farm, LLC ("Pekin Brook") and Stone Wolf Capital Management Company, Pekin Brook's parent ("Stone Wolf"), commenced Chapter 7 cases, by and through their state-court appointed assignor for the benefit of creditors, Raymond Obuchowski, Esq.[3] In September 2020, after the sale of Debtor's real property,[4] the Trust F/B/O Dianne Rose U/A DTD 9/12/02 ("Claimant") filed identical general unsecured claims in each case,[5] only one of which remains before the Court.[6] Claimant asserts a claim in the amount of $796,313.33, based upon a purported promissory note dated July 1, 2018, between Pekin Brook and Claimant in the principal amount of $752,500.00 (the "Rose Trust Claim").[7]

After engaging in informal discovery with Claimant, on January 20, 2022, Paul Levine, Esq., in his capacity as Chapter 7 Trustee, objected to the Rose Trust Claim filed in each case (Claim No. 4 as to Pekin Brook) on a variety of grounds.[8] The crux of the objection is that the funds advanced by Claimant were in fact, and at the time of disbursement, intended to be gifts or loans to Paul Rose individually, the deceased principal of Pekin Brook and Stone Wolf, and the son of Dianne Rose, Claimant's trustee. The funds, which were used for his business ventures, constituted Paul's capital contribution to Stone Wolf in exchange for a controlling equity interest. Thus, the argument continues, the Rose Trust Claim is not a claim against Debtor under § 502(a)[9] but rather, against Paul's estate. Alternatively, if allowed, the Rose Trust Claim should be recharacterized as Paul Rose's equity interest in Pekin Brook and, ultimately, his equity in Stone Wolf.[10]

Briefing and discovery followed, culminating in a three-day evidentiary hearing which resulted in a decision by this Court sustaining the Trustee's objection to claim on the basis that the Note was not supported by consideration as to Pekin Brook and that there was no basis for the Rose Trust Claim against Stone Wolf.[11] An appeal to the District Court followed.[12]

---

[3] Pekin Brook Farm, LLC Docket No. 20-10207 (doc. # 1); Stone Wolf Cap. Mgmt. Co. Docket No. 20-10208 (doc. #1).
[4] *See* doc. # 18. All citations refer to the Pekin Brook docket (No. 20-10207) unless otherwise indicated.
[5] *See* Claim No. 4, Pekin Brook Farm, LLC Docket No. 20-10207; *See* Claim No. 9, Stone Wolf Cap. Mgmt. Co. Docket No. 20-10208.
[6] The Rose Trust did not appeal this Court's previous disallowance of the claim against Stone Wolf and accordingly, the Stone Wolf appeal was dismissed as moot. *See* doc. # 142.
[7] *See* Claim No. 4.
[8] *See* doc. # 53.
[9] All statutory citations refer to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.
[10] In the briefing on remand, the Trustee argues that based upon the evidence presented, the claim must be recharacterized as Stone Wolf's equity interest in Pekin Brook such that the sale proceeds in the Pekin Brook case will flow to its owner, Stone Wolf, and then can be used to pay Stone Wolf's creditors, where most of the claims lie. (doc. #150 at p.2).
[11] *See* doc. # 115, Memorandum of Decision Sustaining Trustee's Objections to Claim No. 4 as to Pekin Brook Farm, LLC and Claim No. 9 as to Stone Wolf Capital Mgmt. Co. Throughout this contested matter, the claims in each case, the objections, and responses thereto, have been lock-step. The pleadings filed contained captions for Debtor and Stone Wolf and the dockets mirror one another. Thus, this Court's decision considered the Trustee's objections to the Rose Trust Claims in each case.
[12] *See* doc. # 119.

On appeal, the District Court determined the Note was supported by consideration in the form of antecedent debt, including credit extended to third parties (Paul, his then-girlfriend, Virginia Kern, and GP Land Management) as well as directly to Pekin Brook. The District Court reversed and remanded to this Court for further consideration of the allowance of the Rose Trust Claim and the Trustee's separate claim for recharacterization of the debt evidenced by the Note.[13]

Claimant did not appeal this Court's decision disallowing the Rose Trust Claim as to Stone Wolf due to a lack of evidence that would render Stone Wolf liable for the debt of Pekin Brook, its subsidiary.[14] Accordingly, the District Court dismissed the Stone Wolf appeal as moot.[15] Thus, the only remaining issues before the Court are those as to Pekin Brook.[16]

### LEGAL ISSUES ON REMAND

Upon receipt of the District Court's Decision, the Court scheduled a hearing and issued a Scheduling Order for additional briefing at the request of the parties.[17] The Trustee and Claimant disagree as to the scope of the remand. Specifically, the parties question whether this Court can (1) consider the alternative arguments for disallowance of the Rose Trust Claim other than a lack of consideration; and (2) determine whether recharacterization is appropriate under the circumstances of this case. The Trustee argues that the scope on remand is broader and includes any issues that this Court did not consider in the first instance.[18] Claimant argues the only issue on remand is whether this Court should recharacterize the Rose Trust Claim.[19] In support of its position, Claimant asserts the "law of the case" doctrine prohibits this Court from considering the Trustee's alternative theories for disallowance.[20] However, Claimant's reliance is misplaced. The law of the case doctrine "applies to issues that have been decided either expressly or by necessary implication."[21] The District Court determined that this Court's decision that the Pekin Note was unsupported by consideration was in error. The District Court expressly declined to explore other bases for disallowance.

Based upon the plain language of the District Court's Decision,[22] this Court determines the scope

---

[13] *See* doc. # 142.
[14] *See* doc. # 142 at p. 11.
[15] *See* doc. # 142 at p. 17.
[16] *See* doc. # 142 at p. 17.
[17] *See* August 18, 2023 Docket Entry setting Status Hearing and doc. # 144 for Scheduling Order.
[18] *See* doc. # 153.
[19] *See* doc. # 152.
[20] *See* doc. # 152 at p. 11.
[21] *Doe v. New York City Dep't. of Social Servs.,* 709 F.2d 782, 788 (2d Cir. 1983), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195 (1983).
[22] The District Court decision reads: "The court reverses the decision of the Bankruptcy Court and remands the case for further consideration of the allowance of the claim." (doc. # 142 at p. 16). The District Court expressed no view on the issue of recharacterization and remanded the case "so that these issues may be fully developed and decided by the Bankruptcy Court in the first instance." (*Id.* at p. 17).

3

on remand includes issues this Court did not consider in the first instance, including other grounds for disallowance of the Rose Trust Claim (other than lack of consideration) and recharacterization. Accordingly, this Court will review the Trustee's alternative arguments relating to disallowance of the Rose Trust Claim and will then turn to whether recharacterization is proper under the facts and circumstances of this case.

## FINDINGS OF FACT

As the District Court recognized, the factual background of this case is extensive.[23] Although the relevant facts are not in dispute, the inferences capable of being drawn from those facts are.

In 2012, Paul Rose purchased real property located at 480 Pekin Brook Road in East Calais, Vermont which was deeded in the name of his then-girlfriend, Virginia Kern (the "Property").[24] The Property was an undeveloped, unimproved tract of land on which Paul Rose and Virginia Kern sought to establish a year-round farming operation.[25] Paul Rose, unable to procure conventional financing for the project, intermittently received funds from the Claimant beginning in October 2012.[26]

Claimant provided a disbursement schedule of the funds disbursed through its trustee, Dianne Rose, who is also Paul Rose's mother.[27] Dianne Rose would make disbursements as requested by Paul Rose.[28] Both Dianne Rose and Herbert Rose, Paul Rose's father, testified that they regarded the disbursements as a loan to Paul Rose.[29] Dianne Rose prepared the disbursement schedule which lists the recipient of each disbursement based on the owner of the bank account to which the funds were sent.[30] It is undisputed that the funds were received by each recipient and used for clearing, construction, and development of the Property.[31]

In early 2014, Paul Rose and Virginia Kern formed GP Land Management, LLC to manage and maintain the Property.[32] In its July 28, 2014 Operating Agreement, Herbert Rose is identified as a co-manager of GP Land Management, LLC.[33] In August 2014, Virginia Kern conveyed the Property to GP Land Management, LLC by quitclaim deed.[34] At some point between the formation of GP Land

---

[23] *See* doc. # 142 at p.3.
[24] *See* doc. # 133 at pp. 63 and 149.
[25] *See* doc. # 133 at pp. 147-150.
[26] Dianne Rose testified that Paul did not have funds to build after buying the farm so he borrowed money against the trust. *See* doc. # 134 at p. 105. She also testified that Paul would not have been able to get a mortgage for the construction and development of the farm. *Id.* at p. 148.
[27] *See* Exhibits 6 and 7.
[28] *See* doc. # 134 at p. 109; Exhibits 6 and 7.
[29] *See* doc. # 134 at p. 109; doc. # 133 at p. 150.
[30] *See* Exhibits 6 and 7.
[31] *See* Exhibit 8.
[32] *See* doc. # 133 at pp. 152-53; Exhibit 26.
[33] *See* doc. # 133 at p. 199; Exhibit CC.
[34] *See* doc. # 133 at p. 63.

Management and after the conveyance of the Property, Paul Rose and Virginia Kern severed personal and business ties.[35] No evidence demonstrates Virginia Kern assigned her membership interest in GP Land Management, LLC.[36]

On or about June 5, 2015, Herbert Rose, on behalf of GP Land Management, LLC, executed a Promissory Note in the principal amount of $602,500 for the benefit of the Claimant (the "GP Note").[37] The distribution schedule attached to the GP Note includes disbursements made to Paul Rose, Virginia Kern, and GP Land Management from October 12, 2012 to June 5, 2015.[38] The GP Note was not secured by a mortgage on the Property and matured on June 30, 2017.[39] No payments were made under the GP Note.[40] The lack of payments under the GP Note was used to create a tax benefit for Claimant as a "bad debt."[41]

On July 14, 2015, after Paul Rose and Virginia Kern had severed personal and business ties, Herbert Rose formed Pekin Brook Farm, LLC to "replace" GP Land Management, LLC to manage and maintain the Property.[42] While Herbert Rose initially testified the name change was necessary to avoid confusion by the inclusion of the word "farm,"[43] he later admitted that the name change was designed to protect the assets from any claim that could be asserted by Virginia Kern.[44] On September 30, 2015, Herbert Rose quitclaimed the Property from GP Land Management, LLC to Pekin Brook Farm, LLC.[45] According to Herbert Rose, at that point, GP Land Management, LLC was "dissolved."[46]

On behalf of Pekin Brook, Herbert Rose signed a "Promissory Note" dated July 1, 2018 (the "Pekin Note") memorializing Pekin Brook's promise to pay Claimant the principal amount of $752,500, with interest at 2.87% each year, compounded annually.[47] The disbursement schedule to the Pekin Note is

---

[35] *See* doc. # 133 at p. 156.
[36] At the time Virginia Kern left, there were only two managers of GP Land Management, Virginia Kern and Herbert Rose. Herbert Rose signed a Certificate of Resolution removing Virginia Kern. Doc. # 133 at pp. 155-58. Although Herbert Rose testified that a document signed by Virginia Kern exists, neither party produced a document signed by Virginia Kern to this effect. *See* doc. # 133 at p. 193.
[37] *See* Exhibit 5. Herbert Rose was a member of GP Land Management, LLC; Paul Rose was not. *See* doc. # 134 at p. 119 and doc. # 133 at p. 160.
[38] *Id.*
[39] *See* Exhibit 5.
[40] *See* Exhibit 28.
[41] *See* doc. # 134 at pp. 17-18 and p. 142.
[42] *See* doc. # 133 at pp. 167-70.
[43] *Id.* at p. 169.
[44] *Id.* at pp. 196-97.
[45] *See* doc. # 133 at pp. 65-66
[46] The only evidence Claimant presented is a "Certificate of Resolution" signed by Herbert Rose and dated September 30, 2015, which removed Virginia Kern as manager and authorized the transfer of its assets to Pekin Brook. The resolution is silent regarding any liabilities. Herbert Rose later informed the Claimant that it had no recourse for payment under the GP Note. *See* Exhibit 29.
[47] *See* Exhibit 6.

5

identical to that of the GP Note with an additional $150,000 identified as being disbursed to Pekin Brook Farm, LLC in three payments dated August 7, 2015, September 8, 2015, and November 9, 2015.[48] The principal amount includes the $602,500 as set forth in the GP Note plus the $150,000 identified as disbursed to Pekin Brook Farm, LLC nearly three years prior to the date of the Pekin Note.[49] The Pekin Note is not secured by a mortgage on the Property.[50] Although Herbert Rose testified that he signed the Pekin Note because he believed Pekin Brook owed the money to Claimant,[51] Dianne Rose did not believe a note was necessary but memorialized one based upon the concerns of her attorney.[52] When asked about the timing of the Pekin Note and specifically that it was signed nearly three years after the latest disbursements, Dianne Rose testified that the creation and signing of the Pekin Note was not a top priority.[53]

Paul Rose was diagnosed with cancer in or around 2017.[54] Based upon his personal medical experience, he decided to shift his business plan to grow hemp and extract cannabidiol, known commonly as "CBD."[55] In 2018, he retained attorney Richard W. Moulton, III to help with the business formation.[56] Paul Rose created Stone Wolf to serve as a parent company in a vertically integrated group of limited liability companies, including Pekin Brook.[57] As part of Stone Wolf's creation, Paul Rose set forth a business plan in which he was actively seeking to raise $2 million in start-up capital.[58] The business plan represented that "Paul has invested substantial personal resources into this venture including approximately $100,00 toward the Essex facility [an extraction laboratory] and other associated expenses and approximately $1.4M into the development of Pekin Brook Farm."[59] The business plan did not mention any indebtedness to Claimant.

In March of 2019, Herbert Rose signed a Membership Interest Transfer Power, transferring his membership interest in Pekin Brook Farm, LLC to Paul Rose.[60] The document is dated July 6, 2018 (the "Membership Transfer").[61] Herbert Rose testified he signed the Pekin Note a few days before he signed the

---

[48] *See* Exhibits 5 and 6.
[49] *Id.*
[50] *See* doc. # 134 at p. 146; Claim No. 4.
[51] *See* doc. # 133 at p. 178.
[52] *See* doc. # 134 at p. 118.
[53] *Id.* at pp. 130-33. The record reflects there were a series of life events that took precedence over memorialization of a note, including but not limited to, Paul Rose's cancer diagnosis and treatment.
[54] *Id.*
[55] *See* Exhibit 7.
[56] *See* doc. # 133 at p. 74.
[57] *Id.* at p. 76.
[58] *See* Exhibit K; doc. # 134 at 25.
[59] *See* Exhibit K. It is undisputed that the development of Pekin Brook included Claimant's disbursements under the Pekin Note.
[60] *See* Exhibit 15. Attorney Moulton testified that the Membership Interest Transfer Power was dated to align with Paul's changing of the Pekin Brook ownership online with the Vermont Secretary of State (doc. # 133 at pp. 100-03).
[61] *Id.*

6

Membership Transfer.[62]

Paul Rose contributed his membership interest in Pekin Brook to Stone Wolf which became the sole member of Pekin Brook.[63] On or around April 10, 2019, third parties, 1701 Enterprise LLC and Abigail and Sacha DuBearn (collectively, the "Investors") invested an aggregate amount of $1,000,000 in Stone Wolf.[64] Paul Rose never disclosed the Pekin Note to the Investors.[65] He never disclosed the Pekin Note to Attorney Moulton;[66] if he had, it would have been disclosed to the potential investors.[67] As part of the capital raise, Pekin Brook disclosed it had no debt.[68]

Shortly thereafter, the relationship between Paul Rose and the Investors deteriorated, eventually determining that the best course of action would be to assign Stone Wolf and Pekin Brook for the benefit of creditors.[69] Paul Rose and the Investors executed General Assignments for Stone Wolf and Pekin Brook, appointing Raymond J. Obuchowski as Assignee.[70] Paul Rose, who prepared the list of creditors for each entity, did not list the Claimant among the creditors of Stone Wolf or Pekin Brook.[71]

Paul Rose passed away in December of 2019.[72] The Claimant asserted a right to payment in March 2020.[73]

## DISCUSSION

Pursuant to sections 501 and 502 of the Bankruptcy Code, an executed and filed proof of claim constitutes *prima facie* evidence of the validity of the claim and is deemed allowed unless a party in interest objects.[74] Courts within this circuit employ a burden-shifting methodology in which a proof of claim is *prima facie* evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion.[75] "To overcome the *prima facie* validity of the claim, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."[76] By

---

[62] *See* doc. # 133 at pp. 182-84 and p. 186.
[63] *See* Exhibit 17.
[64] *See* doc. # 133 at pp. 119-20; Exhibit BB.
[65] *See* doc. # 133 at pp 82-3; 94.
[66] *See* doc. # 133 at pp 82-3.
[67] *Id.*
[68] *See* doc. # 135 at pp. 24-6; 29; doc. # 133 at p. 94.
[69] *See* Exhibits 10, 11 and Q.
[70] *Id.*
[71] *See* Exhibits 10 and 11 and doc. # 133 at p. 30.
[72] *See* doc. # 133 at p. 43.
[73] *See* doc. # 133 at p. 35. Claimant initially contacted Ray Obuchowski, the state court appointed assignor. As part of the state court proceeding, Mr. Obuchowski had sent a letter to creditors in December of 2019 with a bar date of January 17, 2020 to assert claims. Claimant contacted Mr. Obuchowski in March 2020. *Id.*
[74] *See* §§501, 502; *see also* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.")
[75] *See In re Oneida Ltd.,* 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Cocoa Servs., L.L.C.,* No. 17-11936-JLG, 2018 WL 1801240, at *16 (Bankr. S.D.N.Y. Apr. 13, 2018).
[76] *Sherman v. Novak (In re Reilly),* 245 B.R. 768, 773 (2d Cir. BAP 2000) (internal citations omitted); *In re Allegheny Int'l,*

producing "evidence equal in force to the *prima facie* case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant.[77] At that point, the claimant must prove by a preponderance of the evidence that under applicable law the claim should be allowed.[78]

In support of its claims, the Claimant included in each of its proofs of claim (No. 4 in Pekin Brook and No. 9 in Stone Wolf), a copy of the Pekin Note.[79] The first paragraph of the Pekin Note references a schedule of payments, which was not included with the Claimant's claims.[80] At the Trustee's request, the Claimant provided a supplement to the proofs of claim, which included, among other things, the disbursement schedule.[81] It lists the following disbursements: $225,500 to Paul Rose; $105,000 to Virginia Kern; $272,000 to GP Land Management, LLC; and $150,000 to Pekin Brook Farm, LLC.[82] There is no dispute among the parties that the disbursements were made in accordance with the disbursement schedule. Each disbursement other than the $150,000 to Pekin Brook Farm, LLC was made prior to the creation of Pekin Brook Farm, LLC and included in the disbursement schedule attached to the GP Note.[83]

The parties stipulated that with the provision of the disbursement schedule, the Claimant's proofs of claims are *prima facie* valid. However, the Trustee objects to the proofs of claim under §502(b)(1) on the basis that the claims are unenforceable against Pekin Brook. The effect of §502(b)(1) is to make available to the Trustee any defense to a claim that would have been available to the debtors.[84]

**A. Allowance of the Rose Trust Claim as to Pekin Brook.**

The Trustee asserts the Pekin Note is unenforceable against Pekin Brook and its property because the disbursements were not loans to Pekin Brook, but rather gifts to Paul Rose.[85] In support of this position, the Trustee relies upon inferences drawn from the underlying facts. The Trustee relies upon admissions made by Dianne Rose, both during her testimony and from the supplement to the proof of claim provided by Claimant. For example, Dianne Rose's acknowledgements that Paul Rose was unable to secure financing for the construction and development of Pekin Brook; instead, he obtained a loan from the Trust[86] with the

---

*Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992).
[77] *In re Weatherell*, 2010 Bankr. LEXIS 3492, *3, 2010 WL 3938225, *1 (Bankr. D. Vt. Sept. 29, 2010); *Creamer v. Motors Liquidation Co. GUC Tr. (In re Motors Liquidation Co.),* No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013).
[78] *In re Oneida, Ltd.,* 400 B.R. at 389.
[79] *See* Claim No. 4.
[80] *Id.*
[81] *See* Exhibits 5, 6, and 7.
[82] *See* Exhibits 5 and 6.
[83] *See* Exhibit 6.
[84] *See Travelers Casualty & Surety. Co. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450, 127 S.Ct. 1199, 1205-1206, 167 L.Ed 2d 178, 186-187 (2007).
[85] *See* docs. ## 53, 62, 150, and 153.
[86] *See* doc. # 134 at pp. 105 and 148.

8

intent to pay the loan back with interest when the business became profitable.[87] Herbert Rose also testified that Paul Rose took a loan from his mother.[88] The disbursement schedule evidences the monies loaned to Paul Rose.[89] The District Court has recognized that the antecedent debt of Paul Rose constitutes sufficient consideration for the Pekin Note.[90] Those statements do not negate the existence or enforceability of the Pekin Note, which was validly executed by Herbert Rose, who had the authority to sign on behalf of Pekin Brook.[91]

### 1. The Pekin Note is a Valid Note under Delaware law.

Labeling a contract "Promissory Note" does not make it so. Rather, the Pekin Note must meet the definition under Delaware law. Delaware courts have held that that the terms "promissory note," "note," and "negotiable instrument" are interchangeable.[92] Those terms require "a written promise by one person to pay another person, absolutely and unconditionally, a sum certain at a specified time."[93] "[A] promise is unconditional *unless* it states: (1) an express condition to payment; (2) that the promise is subject to or governed by another writing; or (3) that rights or obligations with respect to the promise are stated in another writing."[94] A "sum certain" is an amount that is "fixed" and "can be ascertained from the document."[95] So, Delaware precedent holds that a "promissory note" must be an unconditional promise to pay a fixed amount of money at a particular time.

As the District Court determined, the Pekin Note is a valid promissory note under Delaware law. It contains (1) an unconditional promise (2) to pay a fixed amount (3) at a specified time. Under §502(b)(1), this Court must determine whether the Rose Trust Claim is not enforceable against the Debtor "under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

Pursuant to 6 Del. C. §3-305, there may be limitations to the right to enforce the obligation of a party to pay under the terms of a negotiable instrument.[96] Defenses available to the Trustee on behalf of the Bankruptcy Estate include those defenses that would be available against the Rose Trust as if the Rose Trust were enforcing a right to payment under a simple contract. *See* 6 Del C. §3-305(a)(2).[97] The Trustee has

---

[87] *See* doc. # 134 at pp. 109 and 139.
[88] *See* doc. # 133 at p. 150.
[89] *See* Exhibits 5 and 6.
[90] *See* doc. # 142 at pp. 13-14.
[91] Paul Rose did not have authority to sign the Pekin Note as of July 1, 2018. *See* doc. # 133 at p. 173.
[92] *See Saunders v. Stella,* 1989 WL 89518, at *2 (Del. Super. Ct. June 29, 1989); *Weinstein v. Luxeyard,* 2022 WL 130973, at *3 (Del. Super. Ct. Jan. 14, 2022).
[93] *Saunders,* 1989 WL 89518, at *2) (citing *Promissory Note, Black's Law Dictionary* (5th ed. 1979)); *accord Weinstein,* 2022 WL 130973, at *5; 6 Del. C. §3-104(a).
[94] *Weinstein,* 2022 WL 130973, at *5 (emphasis added); *accord* 6 Del. C. §3-106(a).
[95] *Sum Certain, Black's Law Dictionary* (11th ed. 2019).
[96] 6 Del. C. §3-305(a)(2); see also 6 Del. C. §3-601.
[97] While additional defenses may apply, such as, infancy, duress, illegality, and fraud, 6 Del. C. §3-305(a)(1), the Trustee has not objected to the Rose Trust Claim on any of these bases.

9

raised numerous defenses throughout the course of this contested matter. The Trustee has consistently maintained that the Rose Trust Claim is not enforceable against the Debtor as it is a debt claim against Paul Rose's estate rather than the Debtor.[98] In support of that position, the Trustee raises numerous contract defenses.[99]

### 2. The Contract Defenses Fail to Negate the Pekin Note's Validity.

The Trustee claims that the evidence supports the contract defenses of waiver, novation, and/or estoppel such that the Rose Trust Claim should be disallowed in its entirety. For the reasons set forth below, the Court finds that the Trustee has failed to establish the asserted contract defenses such that the Pekin Note remains valid.

#### a. Waiver

The Trustee asserts Claimant waived the repayment obligation under the Pekin Note. While contract requirements or conditions may be waived,[100] the Delaware standard for proving waiver is "quite exacting."[101] To establish waiver under Delaware law, the Trustee must demonstrate: (1) there is a requirement or condition to be waived; (2) the waiving party knew of the requirement or condition; and (3) the waiving party intended to waive the requirement or condition.[102] The facts relied upon to prove waiver must be unequivocal.[103]

The Pekin Note contains a provision which states that the Pekin Note may be amended or modified "only by a written agreement executed by the Issuer and the Holder."[104] Although this provision may be waived or modified as any other term of the Pekin Note may be waived or modified by conduct of the parties,[105] the Trustee points to no unequivocal evidence demonstrating Claimant intended to waive this requirement or condition.

Nonetheless, the Trustee asserts that Claimant waived the requirement under the Pekin Note that Pekin Brook repay the note. In support of his position, the Trustee claims that compelling evidence exists that Dianne Rose intended to waive the requirement that Pekin Brook, as opposed to her son, repay the loan.

---

[98] *See* doc. # 53, ¶¶47-48; *See also,* doc. # 80 at ¶27 and Appendix 1.
[99] This Court will not consider the Trustee's defense of lack of consideration based upon the District Court decision.
[100] *AeroGlobal Cap. Mgmt. LLC v. Cirrus Indus., Inc.,* 871 A.2d 428, 444 (Del. 2005) (citing *Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972)).
[101] *Id.*
[102] *E.g., AeroGlobal,* 871 A.2d at 444.
[103] *Id.; accord Amrisaleh v. Bd. of Trade of City of New York, Inc.,* 27 A.3d 522, 529 (Del. 2011) ("[T]he facts relied upon to demonstrate waiver must be unequivocal.").
[104] *See* Exhibit 6 at ¶6.3.
[105] *See Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico. Inc.,* 297 A.2d 28, 33 (Del. 1972) ("The prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by he [sic] course of conduct of the parties.")

10

Dianne Rose testified that she had reviewed the Stone Wolf business plan,[106] and acknowledged that Pekin Brook became Paul Rose's equity interest in Stone Wolf.[107] These facts do not unequivocally establish that Dianne Rose, on behalf of Claimant, intended to waive repayment of the Pekin Note. In fact, her testimony indicates otherwise. Even though Paul Rose contributed Pekin Brook to Stone Wolf, he did not want his mother involved in Stone Wolf and intended to pay Claimant back.[108] While the Trustee places great emphasis on Paul Rose's representations to the Investors that Pekin Brook was debt free and that Dianne Rose regards Paul Rose as an honest person, those facts do not establish that Claimant intended to waive the right to repayment. Accordingly, the Trustee has not refuted the *prima facie* validity of Claimant's claim on the theory of waiver.

### b. Novation

The Trustee asserts Claimant, by and through Dianne Rose, entered into an oral agreement with Paul Rose that constitutes a novation under Delaware law, substituting Paul Rose as the obligor in place of Pekin Brook. A novation extinguishes a prior contract and replaces it with a new agreement. Under Delaware law, a party claiming that a contract was novated bears the burden of proving four elements: (1) a valid pre-existing obligation; (2) a valid new contract; (3) extinction of the old contract; and (4) consent of all parties to the novation transaction.[109] While the Pekin Note satisfies the first prong as a valid pre-existing obligation, absent evidence that it was the clear intention of the parties to extinguish the old obligation by substituting a new one, a novation has not been effected. Here, the Trustee has submitted no evidence to establish that Claimant intended a novation which would replace the obligor.

The Court recognizes that some facts in this matter, namely relating to Paul Rose's conduct, complicate the structure of the various transactions. However, Paul Rose's unilateral conduct does not establish the consent of Claimant. The Trustee asks this Court to infer Claimant's consent based upon Dianne Rose's review of the Stone Wolf business plan. While consent may be implied under certain circumstances,[110] the acknowledgement that Paul Rose utilized his interest in Pekin Brook as his equity contribution to Stone Wolf, does not indicate that a novation was intended by Claimant to extinguish the Pekin Note.[111]

---

[106] *See* doc. # 134 at pp. 136-137.
[107] *See* doc. # 134 at pp. 139 and 160.
[108] *See* doc. # 134 at p. 139.
[109] *Aveta Inc. v. Bengoa,* 986 A.2d 1166, 1186 (Del. Ch. 2009).
[110] *Viking Pump, Inc. v. Liberty Mut. Ins. Co.,* 2007 WL 1207107, at *26 n. 110 (Del.Ch. April 2, 2007) ("A party's knowledge of and consent to a novation need not be express but may be implied from his or her conduct or from the surrounding circumstances.")
[111] Where a novation is implied from the parties' actions, "it must be clear that a novation was intended." *Caldera Props.-Lewes/Rehoboth VII, LLC v. Riddings Dev. LLC,* 2009 WL 2231716. At *26 (Del.Ch. July 20, 2007).

### c. Estoppel

In support of his position that Claimant is estopped from asserting its right to repayment, the Trustee asserts Claimant, through Dianne Rose, either intentionally or unintentionally, led Paul Rose to believe that he was justified in representing to the Investors that Pekin Brook was debt free.[112] There is simply no evidence in the record to demonstrate what Paul Rose believed vis a vis the Investors, the Pekin Note, the indebtedness or what he relied upon when forming those beliefs or conducting business. Accordingly, the Trustee cannot meet the elements to establish estoppel.

As the Trustee has failed to successfully demonstrate that the Rose Trust Claim is not enforceable as to Pekin Brook, the Court allows the Rose Trust Claim as to Pekin Brook.

## B. Recharacterization

The Trustee asserts that the Rose Trust Claim should be recharacterized as equity. In making this argument, the Trustee asserts that Claimant's interest should not be recharacterized as its own equity in Pekin Brook but rather, should be recharacterized as Stone Wolf's equity interest in Pekin Brook.[113] The Trustee cites no authority and the Court has found none for the proposition that this Court can recharacterize Claimant's claim to constitute a third party's equity interest.

### 1. Generally

"Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio.*"[114] Courts in the Second Circuit have generally followed the 11-factor *AutoStyle* analysis in deciding whether debt should be recharacterized as equity, and the Court will do so here. The "paradigmatic" recharacterization case involves a situation where "the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims."[115]

A claim to recharacterize debt as equity is different from a claim to equitably subordinate an allowed claim.[116] In contrast to equitable subordination, "[r]echaracterization claims turn on whether a debt actually exists—not on whether the claim should be equitably subordinated or disallowed."[117] If bankruptcy courts were bound by a party's own characterization of its rights against a debtor, "controlling equity owners of a

---

[112] *See* doc. # 150 at p. 25
[113] *See* doc. # 150 at p. 19.
[114] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001) ("*AutoStyle*").
[115] *See Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 74 (Bankr. S.D. N.Y. 2007) ("*Adelphia*").
[116] *See, e.g., Adelphia*, 365 B.R. at 74 (noting that "recharacterization analyses focus on the substance of the transaction, whereas equitable subordination analyses focus on the creditor's behavior").
[117] *Id.* at 73.

12

troubled corporation could jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights."[118] Recharacterization generally involves a situation where "the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inference can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims."[119]

### 2. The *AutoStyle* Factors

In determining whether an investment that purports to be debt should be recharacterized as equity, the Court considers the following under *AutoStyle*:

(1) The name given to the instruments, if any, evidencing the indebtedness;

(2) The presence or absence of a fixed maturity date and schedule of payments;

(3) The presence or absence of a fixed rate of interest and interest payments;

(4) The source of repayments;

(5) The adequacy or inadequacy of capitalization;

(6) The identity of interest between the creditor and the stockholder;

(7) The security, if any, for the advances;

(8) The corporation's ability to obtain financing from outside lending institutions;

(9) The extent to which the advances were subordinated to the claims of outside creditors;

(10) The extent to which the advances were used to acquire capital assets; and

(11) The presence or absence of a sinking fund to provide repayments.[120]

No one of these factors is dispositive; the Court can recharacterize debt as equity even if not all the factors weigh in favor of recharacterization.[121] When considering whether to recharacterize a claim, the Court must look to the overall context of the transaction in the application of each factor.[122] The "ultimate exercise" in evaluating any recharacterization claim is to ascertain the intent of the parties.[123] The intent must be determined by looking at the various factors and weighing them to determine what was really in the minds of the parties making the advances. The claims of creditors who are "insiders" are closely scrutinized.[124]

---

[118] *Sender v. The Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.)*, 380 F.3d 1292, 1298 (10th Cir. 2004) (citation omitted).
[119] *Adelphia*, 365 B.R. at 74.
[120] 269 F.3d at 749-50.
[121] *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 103 (Bankr. S.D.N.Y. 2014).
[122] *Id.* at 94.
[123] *In re Lyondell,* 544 B.R. at 103.
[124] *See In re Micro-Precision Techs., Inc.,* 303 B.R. 238, 247 (Bankr. D. N.H. 2003) (emphasizing that the degree of affiliation between the creditor and the debtor will be positively correlated with the level of scrutiny to which the transactions are subjected in recharacterization requests).

13

### 3. Application of the *AutoStyle* Factors

**(1)    The names given to the instruments, if any, evidencing the indebtedness:**

"The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans."[125] The Rose Trust Claim is based on a "Promissory Note" dated July 1, 2018.[126] The name of the instrument evidences a loan. This factor weighs against recharacterization.

**(2)    The presence or absence of a fixed maturity date and schedule of payments:**

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans…[and] the absence of a set schedule of repayment of principal weighs in favor of equity, but it not dispositive."[127] While the Pekin Note contains a fixed maturity date, there is no schedule of payments to be made.[128] It is unsecured with a maturity date of June 30, 2023.[129] By its terms, it establishes no schedule of regular payments.[130] Even if the Pekin Note contained such a schedule, testimony established that neither GP Land Management nor Pekin Brook made regular payments under either note, and neither was expected to make payments.[131]

This factor does not weigh for or against recharacterization.

**(3)    The presence or absence of a fixed rate of interest and interest payments:**

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans."[132] The Pekin Note includes an interest rate of 2.87% compounded annually.[133] Deferral of interest does not by itself mean the parties converted a debt transaction to equity when repayment was expected and anticipated. This factor weighs against recharacterization.

**(4)    The source of repayments:**

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."[134] The relevant inquiry in deciding whether a claim should be recharacterized as an equity interest is not whether the alleged debt may be paid out of the debtor's revenues, but whether it is to be paid only out of the debtor's profits.[135] While Pekin Brook never

---

[125] *AutoStyle*, 269 F.3d at 750.
[126] *See* Claim No. 4.
[127] *AutoStyle*, 269 F.3d at 750.
[128] *See* Claim No. 4.
[129] *See* Claim No. 4 at 2, 5.
[130] *See* Claim 4 at 5.
[131] *See* doc. # 150 at 10 "her trust was 'lending the farm money, and when they started having revenue, they would pay it back.'" *See also* doc. # 134 at 109.
[132] *AutoStyle*, 269 F.3d at 750.
[133] *See* Claim No. 4 at 5.
[134] *AutoStyle*, 269 F.3d at 751.
[135] *In re Live Primary, LLC*, 626 B.R. 171, 201 (Bankr. S.D.N.Y. 2021) (citing *Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 739 (C.D. Cal. 2012)).

14

made any principal payments under the Pekin Note and Dianne Rose testified that she expected the Pekin Note to be repaid when Pekin Brook began generating revenue, [136] the Pekin Note contains a maturity date without condition.[137] This factor weighs against recharacterization.

### (5) The adequacy or inadequacy of capitalization:

"Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."[138] "Capitalization is assessed both at the time of initial capitalization and subsequent transactions."[139] "Courts should not put too much emphasis on this factor, in any event, because all companies in bankruptcy are in some sense undercapitalized."[140]

At the time of initial capitalization, or when Claimant originally made disbursements, Pekin Brook's capitalization was inadequate.[141] Dianne Rose testified that when Paul Rose and Virginia Kern wanted to begin building the farm that would eventually become Pekin Brook, they did not have the money and that they would not have been able to get a mortgage for the construction and development of the Property.[142] While Claimant argues that Pekin Brook could meet its obligations as they became due, it is undisputed that no payments were being made on the Pekin Note. The record is undeveloped on whether Pekin Brook could have paid the Pekin Note but, the timing of the Stone Wolf capital raise which took place only eight months after the Pekin Note, tends to indicate that Pekin Brook could not have satisfied the Pekin Note. This factor does not weigh for or against recharacterization.

### (6) Identity of interest between creditor and stockholder:

*AutoStyle*'s "identity of interest" factor is typically deployed to establish that a stockholder making a loan to a corporation in proportion to its ownership interest indicates such loan is equity.[143] The Rose Trust is not a member of Pekin Brook Farm, LLC and never was.[144] The "identity of interest" is based upon the familial relationship between Paul Rose, ultimately the sole member of Pekin Brook after the Pekin Note was signed and his mother Dianne Rose, who is the Trustee and beneficiary of the Rose Trust. Hence, this factor weighs against recharacterization.

### (7) The security, if any, for the advances:

"The absence of a security for an advance is a strong indication that the advances were capital

---

[136] *See* doc. # 150 at 10.
[137] *See* Claim No. 4.
[138] *AutoStyle*, 269 F.3d at 751.
[139] *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 575 (Bankr. D. Del. 2012).
[140] *In re B&H Holdings LLC*, 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009).
[141] *See* doc. # 134 at 105.
[142] *See* doc. # 134 at p. 148.
[143] *See In re Sabine Oil & Gas Corp.,* 547 B.R. 503, 567 (Bankr. S.D.N.Y. 2016).
[144] *See* doc. # 134 at p. 136.

Desc    Main Document    Page    16 of 18

contributions rather than loans."[145] Claimant holds no security interest in the assets of Pekin Brook and there is nothing in the record to indicate it was ever a consideration.[146] This factor favors recharacterization.

**(8)    The corporation's ability to obtain financing from outside lending institutions:**

"When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."[147] While Herbert Rose testified that in his personal opinion he believes that Pekin Brook could have taken out a mortgage at the time the Pekin Note was signed,[148] Dianne Rose testified that at the time of the disbursements (which predate the Pekin Note) Paul Rose would not have been able to get a mortgage for the construction and development of the farm, which is why he sought money from Claimant.[149]

Since the Pekin Note addresses the antecedent debt, the operative timeframe is the time of when the disbursements were made, not when the Pekin Note was signed, years later. This factor slightly favors recharacterization.

**(9)    The extent to which the advances were subordinated to the claims of outside creditors:**

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."[150] No subordination agreement exists. This factor does not weigh in favor or against recharacterization.

**(10)    The extent to which the advance was used to acquire capital assets:**

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[151] Substantial testimony demonstrates the disbursements under the Pekin Note were used mainly to acquire capital assets.[152] This factor weighs in favor of recharacterization.

**(11)    The presence or absence of a sinking fund to provide repayments:**

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans."[153] A sinking fund is "a fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt."[154] This factor is only relevant if

---

[145] *AutoStyle*, 269 F.3d at 752.
[146] *See* doc. # 134 at p. 146.
[147] *AutoStyle*, 269 F.3d at 752.
[148] *See* doc. # 133 at pp. 181-182.
[149] *See* doc. # 134 at 148-150.
[150] *AutoStyle*, 269 F.3d at 752.
[151] *AutoStyle*, 269 F.3d at 752.
[152] *See* doc. # 134 at pp. 114-118; Exhibits 8 and 9.
[153] *AutoStyle*, 269 F.3d at 753.
[154] *In re Live Primary, LLC,* 626 B.R. at 206.

16

the purported loan is unsecured.[155] The Pekin Note is unsecured and there is no evidence of a sinking fund to provide repayments. This factor weighs in favor of recharacterization.

    **4. Application of the *AutoStyle* Factors as Proposed is Not Supported by the Bankruptcy Code.**

The Application of the *AutoStyle* factors in this case would be a close call but for the fact that the Trustee seeks recharacterization of the Rose Trust Claim in a non-traditional sense. Generally, a claim for recharacterization seeks to correctly classify a purported debt as equity, as to the entity or person making the claim. Further, the correct classification is as to the claim made against the debtor before the Court.

Here, the Trustee seeks to classify the Rose Trust Claim against Pekin Brook not as equity in Pekin Brook belonging to the Rose Trust. Rather, the Trustee seeks to shift the Rose Trust Claim to Paul Rose, as claimant, and to characterize the claim as equity not in Pekin Brook, but in Stone Wolf. In essence, the Trustee asks this Court to recharacterize (1) the identity of the claimant; (2) the nature of the purported debt as equity; and (3) the identity of the debtor.[156] The facts and circumstances of this case fall well outside the "paradigmatic" recharacterization case.[157]

While §105(a) provides authority for the Bankruptcy Court to recharacterize purported debts to protect the integrity of the bankruptcy process by protecting creditors' priority rights,[158] that authority is not unlimited. The Trustee cites no authority in support of his requested relief.[159] The Bankruptcy Code does not provide authority for the extreme modification of the creditor-debtor relationship as the Trustee proposes.[160] Section 105 does not allow the Court "to override explicit mandates of . . . the Bankruptcy Code."[161] Recharacterization as requested by the Trustee would distort the bankruptcy process and creditors' priority rights as to Pekin Brook, the debtor before the Court.

For the reasons articulated above, the Court declines to recharacterize the Rose Trust Claim as requested.

---

[155] *Id.*

[156] The relief the Trustee requests would allow surplus monies in Pekin Brook to flow to the Stone Wolf bankruptcy estate (as owner of Pekin Brook) and then be used to pay Stone Wolf's creditors where most of the claims lie. The claim as to Stone Wolf was disallowed and thus cannot be recharacterized. If the advance is not a claim to begin with, then recharacterization never comes into play. *See Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd. P'ship)*, 240 B.R. 124, 137 (Bankr. D.D.C. 1999).

[157] As described in *Adelphia,* 365 B.R. at 74.

[158] *See In re Live Primary,* 626 B.R. at 197-198 ("the 'exercise of this power to recharacterize is essential to the implementation of the Code's mandate that creditors have higher priority in bankruptcy than those with an equity interest.'"); *In re Eternal Enterprise, Inc.,* 557 B.R. 277, 287-288 (Bankr. D. Conn. 2018) ("[r]echaracterization, when warranted, is an essential remedy the bankruptcy court has the power and authority to use to preserve the distributional priorities of the Code.")

[159] The cases the Trustee relies upon are easily distinguishable in that they involve the "paradigmatic" underlying facts.

[160] "It has long been established that 'bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.'" *In re Lyondell Chem. Co.*, 544 B.R. at 92 (*citing United States v. Energy Res. Co.*, 495 U.S. 545, 549, 110 S. Ct. 2139 (1990)).

[161] *Law. v. Siegel,* 571 U.S. 415, 421 (2014) (quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105–6 (16th ed. 2013)).

## CONCLUSION

Based upon the facts and circumstances of this case, the Court allows the Rose Trust Claim and finds that recharacterization as requested by the Trustee is not appropriate. Accordingly, the Court overrules the Trustee's objection (doc. # 53) to the Rose Trust Claim (Claim # 4) in its entirety.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

*/s/ Heather Z. Cooper*

March 27, 2024  
Burlington, Vermont

Heather Z. Cooper  
United States Bankruptcy Judge